UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO. 3:16-CV-00276-TBR


MAKI JUILLERAT                                                    PLAINTIFF

v.

UNITED STATES OF AMERICA, *et. al.*                              DEFENDANTS

### MEMORANDUM OPINION AND ORDER

This matter is before the Court on several pending motions. First, Plaintiff Maki Juillerat has moved for summary judgment against all Defendants on the issue of liability. [DN 60.] All Defendants responded to Plaintiff's motion, [DN 66; DN 69], and Plaintiff replied, [DN 76; DN 77.] Second, Defendants the United States of America, Chief Steve Conrad, and Officer Greg Mudd have moved for summary judgment on all of Plaintiff's claims against them. [DN 65; DN 68.] Plaintiff responded to those motions, [DN 76; DN 77], and Defendants replied, [DN 80; DN 83.] Additionally, Plaintiff moved to exclude the United States' expert witness, [DN 67.] The United States responded to that motion, [DN 72], and Plaintiff replied, [DN 74.] Fully briefed, these matters are now ripe for decision.

For the reasons set out in this Memorandum Opinion and Order, Plaintiff's motion for summary judgment and Plaintiff's motion to exclude the United States' expert witness, [DN 60; DN 67], are **DENIED**.

Defendant United States' motion for summary judgment, [DN 65], is **GRANTED IN PART AND DENIED IN PART**.

Defendants Chief Conrad and Officer Mudd's motion for summary judgment, [DN 68], is **GRANTED**.

BACKGROUND

Plaintiff, Maki Juillerat, is a U.S. Army veteran who served more than fifteen years of active duty. [DN 68-2 at 8–9 (Juillerat Deposition).] During his time on active duty, Juillerat was deployed "[o]nce to Bosnia, twice to Iraq and once to Afghanistan," each time working as a paramedic, in addition to performing other jobs such as driving Humvees. [*Id.* at 9.] During his deployments, Juillerat worked in several combat zones. [*Id.* at 7.] Juillerat was medically discharged from the Army in September of 2014. [*Id.* at 6.]

On February 19, 2015, Louisville Metro Police Department ("LMPD") Officer Thomas G. ("Greg") Mudd gave Juillerat a traffic citation for lack of insurance and for disregarding a traffic control officer's signals. [DN 65-2 at 2 (Jefferson County District Court Docket Sheet).] According to Officer Mudd, Juillerat "was very angry and combative during [the] exchange." [DN 65-3 at 9 (Officer Mudd Deposition).]

About a month later, on March 20, 2015, Juillerat attended a counseling session at the Robley Rex Veterans Affairs Medical Center ("VAMC") in Louisville, Kentucky, where he was being treated for posttraumatic stress symptoms and depression. [DN 65-5 at 3 (March 20, 2015 VAMC Mental Health Note).] That day, Juillerat was treated by Dr. Mary Sweeny, Ph.D., a psychologist at the VAMC. In her notes from the March 20, 2015 appointment, Dr. Sweeny wrote the following:

> Indications of risk factors (SI, HI, Abuse, etc.)? He reported both suicidal and homicidal ideation. Said his thoughts of suicide have progressed to thinking of how he would do it. he [sic] said he would probably run his car off the road or crash into a tree or something similar. This would make it less obvious as a suicide and preserve some "honor." Said he should have died overseas "because that would have been honorable." The pt. also reported "he already hates cops" and he recently was ticketed by a cop named Officer Mudd. The pt. said he thought about shooting the cop because he viewed him as unfair and inconsistent. He hasn't planned it out any further than thinking of shooting him but has to go to court on April 2. The pt. said he would make me the same promise he made Dr.

Chopra that he would call 911 or go to ER if he thinks he can't control his impulses to hurt self or others.
Affect: flat, dysthymic, angry

***

[T]he pt. said he was feeling "Shitty" and more depressed, hopeless, frustrated, overwhelmed, and disappointed. His son has commented that he's gotten worse since he's been living with him the past couple of months. His son pointed out that he doesn't bathe, shave, brush his teeth, or even get out of bed like he used to. The pt. declines his son's offers of going out with him. The pt. said he's wrestled with suicidal ideation for a long time but his thoughts have progressed to thinking of a plan. He denied any current intent.

[*Id.* at 4.] In his deposition, Juillerat admitted that he made these statements and that he made them truthfully during his appointment with Dr. Sweeny. [DN 68-2 at 18–19.] Under the heading "Description of Psychotherapy/Counseling/Teaching Interventions & Pertinent Themes Discussed," Dr. Sweeny wrote that she "[p]rovided support and empathetic listening. Assessed his symptoms . . . Both scores are extremely high and suggestive of severe PTSD and depression." [*Id.*]

The following week, on March 27, 2015, Dr. Sweeny's Mental Health Note about Juillerat's March 20 visit was reviewed at an "integrated care staff meeting." [DN 65-7 at 5–6 (Sonny Hatfield Deposition).] The integrated care staff is a team of multi-disciplinary VAMC employees who meet once a month to review various patients. [*Id.* at 5.] The patients who get reviewed "tend[] to be patients who are having some difficulty in their treatment, and notes are put on a smart board so they can be reviewed by everyone at once." [*Id.* at 5–6.] One of the attendees of the integrated care staff meeting was Sonny Hatfield, a licensed social worker who is employed at the VAMC as a "veterans justice outreach specialist." [*Id.* at 3, 5–6.] During his deposition, Hatfield testified that, at the meeting, Dr. Sweeny's note about Juillerat's March 20 visit was brought up, and a discussion ensued about whether employees of the VAMC had a duty

to warn Officer Mudd that Juillerat was a potential danger to him.[1] [*Id.* at 7.] When questioned about the contents of that discussion, Hatfield stated that "[t]here were other clinicians who felt there was a duty to warn. There w[ere] other clinicians who felt like there was not. There was no unanimous feeling or thought in the meeting about the duty to warn." [*Id.* at 10–11.] According to Hatfield, the ultimate decision was that Hatfield would reach out to his contacts at the LMPD and, "simultaneously," the rest of the team would attempt to contact Dr. Sweeny to discuss the Mental Health Note with her. [*Id.* at 12.] However, Hatfield did not wait to confer with Dr. Sweeny about Juillerat before he contacted the LMPD.

Hatfield began by calling LMPD Sergeant Pam Oberhausen, who was off duty and therefore asked Hatfield to send her an email containing the relevant information. [*Id.* at 16; DN 65-2 at 15 (Sergeant Oberhausen Deposition).] Hatfield then sent Sergeant Oberhausen the following email message at 9:16 a.m. on March 27, 2015 with the subject line "duty to warn":

> Sgt. Pam Oberhausen,
>
> In a staff meeting I was made aware after viewing a note than an Officer Mudd was threatened "to be shot" by a patient at the VA. The person in question is
>
> Maki James Juillerat
>
> Also documented in the VA note is that the Veteran will be presenting to court on Thursday April 2nd I [sic] regards to the arrest (?) or citation. Myself and/or Abbe Johnson will be present as part of our reuglar duties in the court that day as VJO's
>
> Thank you for your assistance.

[DN 68-2 at 45 (Email Correspondence).] Hatfield copied other VAMC employees, including Dr. Sweeny, Kelly Montgomery, Abbe Johnson, and Jamie Watts, on the email. Sergeant Oberhausen testified that, upon receiving this email, she "forwarded it to Officer Mudd," and,

---

[1] As the Court will discuss in greater detail below, under Kentucky law, a mental health professional's duty to warn a potential victim arises when a "patient has communicated to the mental health professional an actual threat of physical violence against a clearly identified or reasonably identifiable victim." Ky. Rev. Stat. Ann. § 202A.400(1).

though she could not remember for certain, "probably [also] forwarded it to his supervisors." [DN 60-2 at 17.] Sergeant Oberhausen described her involvement from that point on as minimal, "because that's where they took over." [*Id.* at 18.]

A few hours later, at 12:37 p.m., Dr. Sweeny "replied all" to all the individuals on the email, including Sergeant Oberhausen and Hatfield, and wrote:

> My note went on to say the pt had "no intentions" of actually hurting the officer and he agreed to go to ER or call 911 if he felt like he was losing control over his impulses to hurt self or others. I did not and do not view him as an imminent risk for either suicide or homicide.

[DN 68-2 at 45.] Sergeant Oberhausen did not testify as to whether she also forwarded Dr. Sweeny's reply to Officer Mudd and his supervisors as she had done with Hatfield's original email. [*See* DN 60-2.]

Officer Mudd testified that he could not recall whether Sergeant Oberhausen forwarded the email directly to him or sent him an email summarizing Hatfield's email, but he does recall receiving an email from Sergeant Oberhausen explaining that a patient at the VAMC had threatened to shoot him. [DN 68-3 at 15–16 (Officer Mudd Deposition).] In response, Officer Mudd told his Commanding Officer, Sergeant Ernst, "that there had been a death threat from a man who [he] had cited." [*Id.* at 16.] According to Officer Mudd, Sergeant Ernst responded by telling him to take out a report. [*Id.* at 18.] Another LMPD officer, Officer Jermeco Boleyjack, ultimately took out the police report. [*Id.*] Officer Mudd testified that he relayed to Officer Boleyjack the information conveyed to Officer Mudd in the email from Sergeant Oberhausen and that Officer Boleyjack also called the VAMC to obtain additional information for the report. [*Id.* at 20–21.]

In her deposition, Dr. Sweeny testified that she did not believe that Juillerat made an "actual threat" on March 20, 2015. [DN 60-3 at 26 (Dr. Sweeny Deposition).] Moreover, Dr.

Sweeny testified that deciding whether Juillerat made an actual threat was not a close call or something that she struggled with deciding; rather, she "didn't give it a second thought." [*Id.* at 27.] Dr. Sweeny first learned that Hatfield contacted the LMPD when she checked her email on March 27 and saw that she had been copied on the email from Hatfield to Sergeant Oberhausen. [*Id.* at 28–29.] In other words, Hatfield never discussed Juillerat's statements with Dr. Sweeny before contacting the LMPD. [*Id.* at 29.] Dr. Sweeny testified that, when she saw Hatfield's March 27 email, she "felt stunned." [*Id.* at 31.] After Dr. Sweeny looked back at her notes from her March 20 appointment with Juillerat, she promptly replied to that email explaining that Juillerat did not make an actual threat and that he was not an imminent risk. [*Id.*] Dr. Sweeny also contacted Juillerat and explained to him what happened and advised him to stay calm. [*Id.* at 31.]

Dr. Sweeny also remembers being contacted by an LMPD officer the following week. Though she could not remember the name of the Officer, she stated it was "probably . . . Officer Boleyjack." [*Id.* at 34.] Dr. Sweeny testified that she explained to the LMPD officer who contacted her that the lead psychologist at the VAMC, Dr. Karen Grant, advised her to share only what was necessary but nothing else with the LMPD. [*Id.* at 33–34.] Accordingly, Dr. Sweeny told the officer who called her "that Maki [Juillerat] was not a threat, that he had no intentions of hurting Officer Mudd. That was about the extent of it. I just told him that there was no threat." [*Id.* at 34.]

Officer Mudd testified that, at some point, he asked Officer Boleyjack about the status of the report, and Officer Boleyjack told Officer Mudd that he had spoken with Hatfield "and a doctor" at the VAMC. [DN 68-3 at 23–24.] According to Officer Mudd, Officer Boleyjack told him that, when he spoke to those VAMC employees, they told him that Juillerat was not a threat,

but they would not elaborate any further. [*Id.* at 26.] However, it appears that Officer Boleyjack did not include this information in his report. [*See id.* at 29–30.]

On April 3, 2015, Officer Mudd wrote out a criminal complaint against Juillerat in which he averred that, while Juillerat

> was being seen as a patient in VA Hospital (800 Zorn Avenue), deft stated to Dr. Mary Sweeny that he had thought about shooting Officer Mudd (aft). Deft was angry over a citation that aft have given to deft. A liason [sic] from the VA Hospital informed LMPD about the statement made by deft as a "duty to warn." Aft fears what deft may do. LMPD report 8015023014.

[DN 60-10 (Criminal Complaint).] Officer Mudd testified that he then took the criminal complaint to the Jefferson County Attorney's Office, where a prosecutor read it and wrote out a warrant application for Juillerat's arrest. [DN 68-3 at 32.] The arrest warrant was signed by Jefferson County District Court Judge Stengel on April 3, 2015 at 3:05 p.m. [DN 68-4 (Warrant of Arrest).]

Juillerat was arrested pursuant to that warrant on April 5, 2015 on the charge of terroristic threatening in the third degree by LMPD Officer Chris Baker. [*See* DN 60-6 at 1 (CourtNet Record); DN 68-4.] Juillerat remained in custody until his release on April 16, 2015, [*Id.* at 2.] The charge against Juillerat was ultimately dismissed on May 7, 2015, after Jefferson County District Court Judge Collins determined that the arrest "warrant [was] insufficient on [its] face to be terroristic threatening." [*Id.* at 1–2.]

Juillerat filed the instant tort action in Kentucky state court on April 5, 2016, asserting numerous tort claims against several Defendants. [DN 1-1 (State Court Complaint).] The United States removed this case to the United States District Court for the Western District of Kentucky on April 16, 2016. [DN 1 at 3.] Following this Court's rulings on several motions to dismiss, the remaining Defendants in this case are the United States, LMPD Chief Steve Conrad, and LMPD

Officer Greg Mudd. Juillerat and all Defendants have each moved for summary judgment as to Juillerat's claims. The Court will address those claims, and the pending motions for summary judgment, in the pages that follow.

## STANDARD

Summary judgment is appropriate when the record, viewed in the light most favorable to the nonmoving party, reveals "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists where "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The Court "may not make credibility determinations nor weigh the evidence when determining whether an issue of fact remains for trial." *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014) (citing *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001); *Ahlers v. Schebil*, 188 F.3d 365, 369 (6th Cir. 1999)). "The ultimate question is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Back v. Nestlé USA, Inc.*, 694 F.3d 571, 575 (6th Cir. 2012) (quoting *Anderson*, 477 U.S. at 251–52).

The moving party must shoulder the burden of showing the absence of a genuine dispute of material fact as to at least one essential element of the nonmovant's claim or defense. Fed. R. Civ. P. 56(c); *see also Laster*, 746 F.3d at 726 (citing *Celotex*, 477 U.S. at 324). Assuming the moving party satisfies its burden of production, the nonmovant "must—by deposition, answers to interrogatories, affidavits, and admissions on file—show specific facts that reveal a genuine issue for trial." *Laster*, 746 F.3d at 726 (citing *Celotex*, 477 U.S. at 324). "[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact." *Street v. Bradford & Co.*, 886

F.2d 1472, 1477 (6th Cir. 1989). The test is "whether the party bearing the burden of proof has presented a jury question as to each element in the case." *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996). Nor will mere speculation suffice to defeat a motion for summary judgment: "[t]he mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment. A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996).

DISCUSSION

The Court will address each of Juillerat's claims against each Defendant in turn, simultaneously discussing whether any party in the case is entitled to summary judgment on a given claim or whether there exist genuine disputes of material fact for trial.[2] [3]

### A. Negligence

Juillerat asserts a claim of negligence against all Defendants; specifically, the United States, Chief Conrad, and Officer Mudd.[4]

### 1. Against the United States

Juillerat claims that the negligent "conduct in this case [on behalf of the United States] was the disclosure [by Hatfield] of confidential statements made in therapy." [DN 77 at 6 (Juillerat's Response to the United States's Motion for Summary Judgment).] In other words, according to Juillerat, the United States is liable due to "the breach of a duty to keep confidential

---

[2] Though Juillerat appears to reference an invasion of privacy claim at various points in his motion for summary judgment and subsequent briefing, [*see, e.g.*, DN 60-1 at 13–14], the Court will not address that claim, as the Court concluded in a prior opinion that this claim is barred against the United States under the libel and slander exception of the Federal Tort Claims Act. [DN 33 at 15–18.]

[3] Although Juillerat listed "negligence per se" on the first page of his Complaint among several other claims, [DN 1-1 at 4], Juillerat did not include negligence per se in any of the counts of his Complaint, nor did he mention it at the motion to dismiss stage or in his summary judgment motion. Accordingly, the Court deems this claim to be waived.

[4] At the motion to dismiss stage, the Court dismissed the claims against Chief Conrad and Officer Mudd in their official capacities on sovereign immunity grounds. Accordingly, the only remaining claims against those Defendants in this case are asserted against them in their individual capacities. [DN 31 at 7–8; DN 50 at 5–6.]

medical information confidential." [*Id.* at 7.] Juillerat bases his claims of negligence against the

United States on Kentucky statutes that address a mental health professional's duty to warn an

intended victim of a patient's potential violence. KRS § 202A.400 provides, in part:

> (1) No monetary liability and no cause of action shall arise against any mental health professional for failing to predict, warn of or take precautions to provide protection from a patient's violent behavior, unless the patient has communicated to the mental health professional an actual threat of physical violence against a clearly identified or reasonably identifiable victim . . . .

> (2) The duty to warn of or to take reasonable precautions to provide protection from violent behavior arises only under the limited circumstances specified in subsection (1) of this section. The duty to warn a clearly or reasonably identifiable victim shall be discharged by the mental health professional if reasonable efforts are made to communicate the threat to the victim, and to notify the police department closest to the patient's and the victim's residence of the threat of violence . . . .

> (3) No monetary liability and no cause of action shall arise against any mental health professional for confidences disclosed to third parties in an effort to discharge a duty arising under subsection (1) of this section according to the provisions of subsection (2) of this section.

Ky. Rev. Stat. Ann. § 202A.400.

According to Juillerat, he never communicated "an actual threat of physical violence"

against Officer Mudd and, therefore, Hatfield never had any duty to warn Officer Mudd pursuant

to Kentucky law. The Supreme Court of Kentucky has construed § 202A.400 as follows:

> By using the word "communicated," we believe the legislature intended to require a current, active expression, by words or gestures, verbal or non-verbal, to the professional; a threat capable of avoidance, not a mere passive presence from which the professional must attempt to discern if a patient poses a threat of harm. A part of the obvious purpose of the statute, because subsection (3) addresses it, is to strike a balance between the ethical duty of the mental health professional to protect a patient's confidentiality and the moral duty to prevent harm to others . . . Thus, we hold that the duties described in KRS 202A.400(2) arise only when the patient has communicated to the mental health professional, directly or indirectly, by words or gestures, that he *will* commit an act of physical violence. Simply *being* a threat of physical violence does not constitute communicating a threat of physical violence.

*Devasier v. James*, 278 S.W.3d 625, 632 (Ky. 2009). Juillerat relies on the opinion of its expert witness, Eric Drogin, J.D., Ph.D., ABPP, as evidence that he never communicated an actual threat to Dr. Sweeny and, by extension, to Hatfield. Drogin is "a licensed clinical psychologist and a Fellow of the American Academy of Forensic Psychology, certified as a forensic psychologist by the American Board of Professional Psychology and the American Board of Forensic Psychology, and regularly engaged in the practice of forensic psychological consultation." [DN 60-12 at 1 (Drogin Affidavit).] According to Drogin, "an objective reading" of Dr. Sweeny's March 20 Mental Health Note "does not amount to an 'actual threat of physical violence' as contemplated by KRS 202A.400(1)." [*Id.* at 2.]

Juillerat also relies on the testimony of Dr. Sweeny, who testified in her deposition that she did not believe that Juillerat made an "actual threat" during their appointment on March 20, 2015. [DN 60-3 at 26.]

In its response to Juillerat's motion and in its own motion for summary judgment, the United States argues that the proper inquiry is whether Hatfield acted negligently; that is, whether he acted in conformance with generally accepted professional practices by reporting Juillerat's statement to the LMPD. [*See* DN 65-1 at 15–16.] In making this argument, the United States relies on KRS § 202A.301, entitled "Exemption from personal liability," which provides:

> Persons carrying out duties or rendering professional opinions as provided in this chapter shall be free of personal liability for such actions, provided that such activities are performed in good faith within the scope of their professional duties and in a manner consistent with accepted professional practices.

Ky. Rev. Stat. Ann. § 202A.301. Section 202A.301 is included in the same chapter as the duty to warn statute, and seeks to limit the liability of persons carrying out duties enumerated in Chapter 202A of the Kentucky Revised Statutes. According to the United States, then, regardless of whether a duty to warn existed, Hatfield can only be liable if he did not act in good faith and "in

11

a manner consistent with accepted professional practices." [DN 65-1 at 15–16.] The United States contends that Hatfield did just that. For instance, the United States relies on the testimony of its expert witness, Dr. Stuart B. Kleinman, M.D. Dr. Kleinman is an adjunct Professor in Psychiatry at the New York University School of Medicine, an Associate Clinical Professor of Psychiatry at the Columbia University College of Physicians and Surgeons, and is board certified in Forensic Psychiatry. [DN 65-19 at 2–4.] Dr. Kleinman opined that "[i]t can be concluded with a reasonable degree of medical-psychiatric certainty that it would be reasonable for a mental health professional who reviewed Dr. Sweeny's treatment note of March 20, 2015" to conclude 1) "that this note communicates that Mr. Juillerat was reasonably likely in the near future to act physically violently toward Officer Mudd and/or immediately associated law enforcement personnel, and as a consequence of such;" 2) "that it was necessary to warn Officer Mudd and/or immediately associated law enforcement personnel of this danger." [DN 65-20 (Dr. Kleinman's Forensic Psychiatric Conclusion).] The United States contends that, "[s]uccinctly put, Kleinman offered expert testimony that Hatfield did not breach a standard of care within the psychotherapy community." [DN 65-1 at 16.]

Juillerat moved to strike Dr. Kleinman's expert testimony, arguing that he relied on an improper and irrelevant standard. [DN 67.] Specifically, Juillerat claims that Dr. Kleinman completely failed to discuss whether Juillerat "communicated to the mental health professional an actual threat of physical violence against a clearly identified or reasonably identifiable victim." [DN 67 at 2]; Ky. Rev. Stat. Ann. § 202A.400(1). However, according to the United States, Dr. Kleinman's expert testimony does conclude that Juillerat made an "actual threat," and, moreover, squarely addresses the issue of whether Hatfield acted reasonably for purposes of the "good faith" and "accepted professional practices" elements of KRS § 202A.301. The Court

agrees that Dr. Kleinman's opinions are relevant to the issue of whether Hatfield acted reasonably and in good faith. [DN 72.] Moreover, because the Court is to be the factfinder in this case, the Court notes that it will only consider Dr. Kleinman's testimony to the extent it finds that testimony to be relevant and helpful. Accordingly, Juillerat's motion to exclude, [DN 67], is denied.

On the whole, the Court finds that the issues of whether Juillerat "communicated . . . an actual threat" and whether Hatfield acted reasonably and in good faith in reporting Juillerat's comments to the LMPD to be fairly close calls. Accordingly, at this time, the Court feels that both of these issues are better suited to determination at the close of all the proof in this case. Accordingly, both Juillerat and the United States' motions for summary judgment as to Juillerat's negligence claim against the United States are denied.

### 2. Against Officer Mudd

Juillerat also asserts that Officer Mudd was negligent by omitting material information when swearing out his criminal complaint and seeking a warrant for Juillerat's arrest. [DN 60 at 20–24.] Specifically, Juillerat contends that, though Dr. Sweeny replied to Hatfield's original email to explain that Juillerat had "no intentions" of actually hurting Officer Mudd, and though Officer Mudd testified that Officer Boleyjack told him that employees at the VAMC told him Juillerat was not a threat, Officer Mudd failed to include any of this information in his criminal complaint. In response, Officer Mudd contends that "[t]here is no evidence in the record that anyone at LMPD actually received the [follow-up] email" from Dr. Sweeny or that Officer Boleyjack discussed his conversations with the VAMC employees *before* Officer Mudd wrote his criminal complaint. [DN 69 at 3–4.]

"The elements of a negligence claim are (1) a legally-cognizable duty, (2) a breach of that duty, (3) causation linking the breach to an injury, and (4) damages." *Patton v. Bickford*, No. 2013-SC-000560-DG, 2016 WL 9526879, at *8 (Ky. Mar. 17, 2016), *reh'g denied* (Aug. 24, 2017) (citing *Pathways, Inc., v. Hammons*, 113 S.W.3d 85, 88 (Ky. 2003)). "Duty presents a question of law, whereas breach and injury are questions of fact for the jury to decide." *Id.* Juillerat's negligence claim against Officer Mudd fails for two reasons. First, alleged victims of crimes have no duty to conduct an investigation before reporting a crime. *See, e.g., Bertram v. Fed. Exp. Corp.*, No. Civ.A. 05-28-C, 2008 WL 170063, at *6 (W.D. Ky. Jan. 17, 2008) (explaining that the creation of a duty for a company to conduct its own investigation into an alleged theft crime before reporting it "would be contrary to the public policy that encourages the reporting of crimes in a timely manner, thus weighing against the imposition of such a duty.") (citing *Ferguson v. Richards,* 271 S.W.2d 29, 30 (Ky. 1954)). Accordingly, because alleged victims of crimes do not have a duty to fully investigate crimes before reporting them, the Court finds that Officer Mudd owed no legally-cognizable duty to Juillerat and therefore cannot be liable for negligence.

Second, "a 'plaintiff cannot proceed with a claim for negligence where the claim is really a malicious prosecution claim.'" *Harris v. Goins*, No. CV 6:15-151-DCR, 2017 WL 3097613, at *21 (E.D. Ky. July 20, 2017) (quoting *Tunne v. Paducah Police Dep't*, No. 5:08 CV-188-R, 2010 WL 323547, at *11 (W.D. Ky. Jan. 21, 2010) (Russell, J.)). "Kentucky has long recognized an action for malicious prosecution where the suit was instituted with malice and without probable cause." *Hill v. Willmott*, 561 S.W.2d 331, 334 (Ky. Ct. App. 1978) (citing *Harter v. Lewis Stores*, 240 S.W.2d 86 (Ky. 1951)).

The policy considerations addressed by the elements of a malicious prosecution action would be thwarted if the plaintiff were allowed to proceed on a theory of

negligence. The plaintiff may not avoid the higher standards of malicious-prosecution claims by bringing negligence claims against the defendants under the same facts that constitute his other claims.

*Bertram v. Federal Express Corp.*, No. CIV.A. 05-28-C, 2008 WL 170063, at *7 (W.D. Ky. Jan. 17, 2008) (citing *Hill v. Willmott*, 561 S.W.2d 331, 334 (Ky. Ct. App. 1978)). Accordingly, whether Officer Mudd omitted information from his criminal complaint, which may or may not have affected the probable cause determination, is best directed toward a malicious prosecution claim. Because Juillerat did not assert such a claim, and because he cannot maintain his negligence claim in this case, Officer Mudd's motion for summary judgment as to Juillerat's negligence claim is granted.

### 3. Against Chief Conrad

Juillerat also claims that Chief Conrad acted negligently by failing to be aware of and properly enforce various LMPD policies and procedures. [DN 60-1 at 14–20.] Juillerat argues that, "When asked what the rules were regarding an officer is the subject of an alleged threat, and how to handle the investigation on that threat, [Chief Conrad] responded 'We have a policy manual that is over 800 pages. I do not know that policy manual well enough to be able to answer your question.'" [DN 60-1 at 15 (Citing Conrad Deposition).] Juillerat claims that, based on this testimony, "Conrad concedes that the policies and procedures, which he is responsible for, are impossible to follow and thus impossible to enforce, given their breadth and complexity." [*Id.*] However, Juillerat never points to a policy or procedure applicable to the instant matter which he alleges Chief Conrad failed to enforce. The most Juillerat alleges is that "Chief Conrad could have and should have enforced LMPD policies to prevent officers who are alleged victims from working on those cases. In this case, enforcement of LMPD policy could have prevented Officer Greg Mudd's involvement in Juillerat's terroristic threatening case." [*Id.*

at 16.] However, Juillerat never demonstrates what involvement Officer Mudd had in the investigation which Juillerat alleges was unlawful or improper. All Juillerat alleges, and Officer Mudd does not dispute, that Officer Mudd wrote a criminal complaint which stated that, while Juillerat

> was being seen as a patient in VA Hospital (800 Zorn Avenue), deft stated to Dr. Mary Sweeny that he had thought about shooting Officer Mudd (aft). Deft was angry over a citation that aft have given to deft. A liason [sic] from the VA Hospital informed LMPD about the statement made by deft as a "duty to warn." Aft fears what deft may do. LMPD report 8015023014.

[DN 60-10 (Criminal Complaint).] Officer Mudd then took his criminal complaint to the Jefferson County Attorney's office, where a prosecutor read it and wrote out a warrant application for Juillerat's arrest which included the excerpt from the criminal complaint. [DN 68-3 at 32.] The arrest warrant was signed by Jefferson County District Court Judge Stengel on April 3, 2015, [DN 68-4], and executed on April 5, 2015 by Officer Baker. [DN 68-4; 68-7.]

Juillerat does not allege that Officer Mudd himself filled out an arrest warrant or that Officer Mudd himself arrested Juillerat. Rather, Juillerat vaguely asserts that, "because Conrad refused to enforce his own policies, Mudd was allowed to participate in the terroristic threatening investigation, and swore out a warrant for Plaintiffs arrest." [DN 60-1 at 17.] This is a slight mischaracterization, however. Officer Mudd testified that Officer Boleyjack, rather than himself, performed the investigation and completed the police report. [DN 68-3 at 16.] Although Officer Mudd stated that he gave Officer Boleyjack the information contained in the email from Sergeant Oberhausen, it was Officer Boleyjack, not Officer Mudd, who incorporated this information into the report. Merely relaying information to the investigating officer is no different than any other victim would be asked to do under similar circumstances. And, it was Officer Boleyjack, not

Officer Mudd, who called the VAMC to obtain additional information for the report. [*Id.* at 20–21.]

Moreover, Officer Mudd did not "sw[ear] out a warrant for Plaintiff's arrest," as Juillerat claims. Rather, the prosecutor incorporated the paragraph from Officer Mudd's criminal complaint into the arrest warrant application. In sum, Juillerat has failed to demonstrate that Officer Mudd improperly participated in the criminal investigation or that such participation could have been prevented if Chief Conrad had properly enforced any LMPD policies. To the contrary, Juillerat has identified no such polices that prohibit involvement.

Next, Juillerat contends that Officer Mudd violated several LMPD Standard Operating Procedures ("SOPs") by allegedly omitting information from his criminal complaint, and that Chief Conrad is acting negligently by refusing to investigate the matter. [DN 60-1 at 17–20.] During his deposition, Chief Conrad explained that a Professional Standards Unit ("PSU") investigation into an LMPD officer be initiated either by a "sworn affidavit from a citizen who believes that they've been wronged in some way" or by Chief Conrad himself. [DN 68-5 at 11.] In the latter situation, Chief Conrad explained that whether to initiate a PSU investigation against an officer absent a sworn affidavit is "within [his] discretion." [DN 68-5 at 12.] In his response, Chief Conrad alleges that, because the decision of whether to investigate an LMPD officer is discretionary, he is entitled to qualified immunity on that ground. [DN 69 at 18.]

> [W]hen sued in their individual capacities, public officers and employees enjoy . . . qualified official immunity, which affords protection from damages liability for good faith judgment calls made in a legally uncertain environment . . . Qualified official immunity applies to the negligent performance by a public officer or employee of (1) discretionary acts or functions, *i.e.,* those involving the exercise of discretion and judgment, or personal deliberation, decision, and judgment, (2) in good faith; and (3) within the scope of the employee's authority.

*Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001) (internal citations omitted).

Here, Juillerat does not dispute Chief Conrad's argument that his decision of whether to investigate an officer is within his discretion. Chief Conrad testified in his deposition that he had only learned of Juillerat's lawsuit two weeks prior and, "[a]t this stage," he did not believe there was a "need for a PSU investigation." [DN 68-5 at 12.] There is also no indication that Chief Conrad's decision not to initiate a PSU investigation was not made in good faith. Chief Conrad simply testified that he "review[ed] the complaint . . . And based on what [he] read did not think there was a need to initiate an investigation." [*Id.* at 13–14.]  However, Chief Conrad went on to explain that Juillerat "would always have the opportunity to file an affidavit. And based on that affidavit we would initiate and complete an investigation." [*Id.* at 14.] Based on this testimony, it appears that Chief Conrad would have willingly conducted an investigation had Juillerat filed a sworn affidavit; however, in the absence of one, Chief Conrad, in his discretion, did not believe an investigation was necessary. Based on this testimony, the Court finds that Chief Conrad is entitled to qualified immunity relating to his decision of whether to initiate a PSU investigation of his own accord. Therefore, his motion for summary judgment as to Juillerat's negligence claim is granted.

### B. Gross Negligence

Juillerat also asserts a gross negligence claim against all Defendants.

> Under Kentucky law, gross negligence is "something more than the failure to exercise slight care." *City of Middlesboro v. Brown*, 63 S.W.3d 179, 181 (Ky. 2001) (quoting *Cooper v. Barth, Ky.*, 464 S.W.2d 233, 234 (Ky. 1971)). In fact, "there must be an element either of malice or willfulness." *Id.* More recently, the Kentucky Supreme Court has defined "gross negligence," in the context of punitive damages, as requiring a "finding of failure to exercise reasonable care, and then an additional finding that this negligence was accompanied by wanton or reckless disregard for the lives, safety or property of others." *City of Middlesboro*, 63 S.W.3d at 181 (citing *Horton v. Union Light, Heat & Power Co.*, 690 S.W.2d 382, 389-90 (Ky. 1985)).

*Gaither v. Beam Partners, LLC*, No. 3:16-CV-0094-GFVT, 2017 WL 1217166, at *6 (E.D. Ky. Mar. 31, 2017).

With regard to Hatfield, Juillerat has failed to demonstrate any alleged malice or willfulness on Hatfield's behalf. In his deposition, Juillerat acknowledged that he can empathize with Hatfield's decision to warn Officer Mudd and the LMPD. [DN 68-2 at 22, 31.] Moreover, Juillerat testified that Hatfield visited him in jail and "was extremely apologetic," to which Juillerat responded "I can understand why you would do something, but to me you stepped it when you didn't ask [Dr. Sweeny] as a professional courtesy." [*Id.* at 27.] Without any evidence that Hatfield acted willfully or maliciously, the United States is entitled to summary judgment as to Juillerat's gross negligence claim.

With regard to Officer Mudd, Juillerat claims that "Officer Greg Mudd knew there was no 'actual threat' from Maki Juillerat and proceeded to have Juillerat incarcerated, nonetheless. Then Mudd lied in, and intentionally omitted material evidence from the *Warrant of Arrest Complaint* in order to have Juillerat arrested." [DN 60 at 24.] However, for the same reasons discussed above, these claims are properly suited for a malicious prosecution claim, not a negligence or gross negligence claim. Accordingly, Officer Mudd is also entitled to judgment as a matter of law on Juillerat's gross negligence claim.

With regard to Chief Conrad, Juillerat repeats his allegation that Chief Conrad "refus[ed] to exercise even slight care to enforce the standard operating procedures of LMPD." [DN 60-1.] However, the Court already determined above that Juillerat failed to demonstrate that this was the case. And to the extent Juillerat alleges that Chief Conrad has negligently failed to investigate Officer Mudd, once again, the Courts again notes that whether to initiate an investigation is within Chief Conrad's own discretion, and he is therefore entitled to qualified immunity on that

ground. Accordingly, summary judgment in favor of the United States, Chief Conrad, and Officer Mudd is proper on Juillerat's claims for gross negligence.

### C. Intentional Infliction of Emotional Distress and Negligent Infliction of Emotional Distress

Juillerat brings his claims of intentional infliction of emotional distress ("IIED") and negligent infliction of emotional distress ("NIED") against all Defendants.

To prove a claim of intentional infliction of emotional distress, a plaintiff must prove the following elements: "(1) intentional or reckless conduct; (2) that was outrageous or intolerable and offends against the generally accepted standards of decency and morality; (3) which caused emotional distress; and (4) the distress was severe." *McDonald's Corp. v. Ogborn*, 309 S.W.3d 274, 293–94 (Ky. Ct. App. 2009) (citing *Humana of Kentucky, Inc. v. Seitz,* 796 S.W.2d 1, 2–3 (Ky. 1990)).

To prove negligent infliction of emotions distress, a plaintiff must first prove the elements of a standard negligence claim, meaning 1) duty, 2) breach, 3) causation, and 4) damages, and then, as with an IIED claim, must demonstrate 5) severe emotional injury. *Osborne v. Keeney*, 399 S.W.3d 1, 17–18 (Ky. 2012).

The Supreme Court of Kentucky has made clear that, for both IIED and NIED, "recovery should be provided only for 'severe' or 'serious' emotional injury." *Id.* at 17. According to the *Osborne* court, "[a] 'serious' or 'severe' emotional injury occurs where a reasonable person, normally constituted, would not be expected to endure the mental stress engendered by the circumstances of the case. Distress that does not significantly affect the plaintiff's everyday life or require significant treatment will not suffice." *Id.* And, importantly for purposes of the instant case, "a plaintiff claiming emotional distress damages must present expert medical or scientific proof to support the claimed injury or impairment. *Id.* at 17–18; *see also Indiana Ins. Co. v.*

*Demetre*, No. 2015-SC-000107-DG, 2017 WL 3635500, at *21 (Ky. Aug. 24, 2017) ("[H]old[ing] that *Osborne*'s requirement of expert medical or scientific proof is limited to claims of intentional or negligent infliction of emotional distress.").

Here, Juillerat testified in his deposition that, following his incarceration on the terroristic threatening charge, he experiences paranoia, high blood pressure, and a much higher level of anxiety. [DN 68-2 at 29–30.] For instance, Juillerat stated that if he hears sirens, he worries that law enforcement may be coming for him. [*Id.* at 29.] However, Juillerat has provided no medical or scientific evidence documenting the serious or severe emotional injury he alleges that he experienced as a result of Defendants' conduct. Because Kentucky courts have emphasized the mandatory nature of such medical or scientific corroborating evidence in IIED and NIED cases, without any such evidence here, Juillerat has not carried his burden of demonstrating a severe emotional injury of the type that "significantly affect[s] the plaintiff's everyday life or require[s] significant treatment." Accordingly, Juillerat's claims of IIED and NIED fail as a matter of law. Because the Court finds that Juillerat has failed to prove the requisite severe emotional distress element, the Court need not address whether Juillerat satisfied the other elements of IIED or NIED. For these reasons, Juillerat's motion for summary judgment as to his claims of IIED and NIED will be denied, and the United States and the LMPD Defendants' motions will be granted as to these claims.

### D. False Imprisonment

Juillerat asserts his claim of false imprisonment against both Officer Mudd and Chief Conrad.[5] "Kentucky cases define false imprisonment as being any deprivation of the liberty of

---

[5] Juillerat states in his summary judgment motion that "Hatfield's gross negligence and invasion of privacy *led to* the false imprisonment of the Plaintiff," Juillerat does not appear to actually assert a false imprisonment claim against the United States. [*See* DN 60-1 at 5.] Moreover, Juillerat did not plead a claim of false imprisonment

one person or detention by another without the person's consent whether done by actual violence, threats or otherwise." *Akers v. Roberts*, No. 2014-CA-001394-MR, 2016 WL 1178681, at *5 (Ky. Ct. App. Mar. 25, 2016) (citing *Banks v. Fritsch,* 39 S.W.3d 474, 479 (Ky. Ct. App. 2001)). In order "[t]o sustain a recovery for the tort of false imprisonment, a complainant must establish that he was detained and that the detention was unlawful." *Id.* (citing *Great Atlantic & Pacific Tea Co. v. Smith,* 136 S.W.2d 759, 767 (Ky. 1939)). Kentucky courts have further held that "[a] law enforcement officer is liable for false imprisonment unless he or she enjoys a privilege or immunity to detain an individual." *Brown v. Fournier*, No. 2015-CA-001429-MR, 2017 WL 2391709, at *6 (Ky. Ct. App. June 2, 2017), *review denied* (Sept. 20, 2017) (quoting *Dunn v. Felty*, 226 S.W.3d 68, 71 (Ky. 2007)). According to the Supreme Court of Kentucky,

> [t]wo common examples of a law enforcement officer's privilege to detain an individual are (1) an arrest pursuant to a warrant or (2) an arrest without a warrant in which the officer has "probable cause, that is, reasonable objective grounds to believe that a crime was committed and that the plaintiff committed it." . . . The common element of both examples is that the detention was lawful as it occurred pursuant to legal process.

*Dunn*, 226 S.W.3d at 71 (citations omitted).

In their motion for summary judgment, Chief Conrad and Officer Mudd argue that Juillerat's claim of false imprisonment fails as a matter of law because he was detained "pursuant to legal process." [DN 68-1 at 13–15.] The Court agrees. Here, Mudd swore out a criminal complaint stating that Juillerat told Dr. Sweeny "that he had thought about shooting Officer Mudd." [DN 60-10.] In his deposition, Juillerat did not dispute the accuracy of how Officer Mudd phrased his criminal complaint. [DN 68-2 at 25.][6] After Juillerat presented his complaint

---

against Hatfield (and, by effect, the United States) in his Complaint. [*See* DN 1-1.] Accordingly, the Court assumes that Juillerat has not asserted the claim of false imprisonment against the United States.

[6] Juillerat *did* dispute, however, the phrasing of Sonny Hatfield's email to the LMPD in which he stated that Officer Mudd was threatened "to be shot." [DN 68-3 at 22–23.] This language was different from the "thought about shooting" language Officer Mudd included in his criminal complaint, however. [*See* DN 60-10.]

to the Jefferson County Attorney's Office, a prosecutor applied for an arrest warrant, which Jefferson County District Court Judge Stengel signed on April 3, 2015. [DN 68-4.] Juillerat was then lawfully arrested pursuant to that warrant on April 5, 2015. True, a different Jefferson County District Court Judge ultimately dismissed the terroristic threatening charge on May 7, 2015 after finding that the "warrant [was] insufficient on [its] face to be terroristic threatening." [DN 60-6 at 1–2.] However, the fact that the charge was ultimately dismissed over a month later does not render Juillerat's arrest, which, was made pursuant to an arrest warrant, unlawful. In sum, because Juillerat has failed to demonstrate that his detainment was unlawful, his false imprisonment claim fails as a matter of law. Accordingly, Juillerat's motion for summary judgment as to his false imprisonment claim is denied, and Chief Conrad and Officer Mudd's motion for summary judgment as to this claim is granted.

### E. Qualified Immunity

Officer Mudd and Chief Conrad have argued that each are entitled to qualified immunity from suit on various claims asserted against them in their individual capacities. As explained above, the Court determined that Chief Conrad is entitled to qualified immunity on Juillerat's claim that Chief Conrad has negligently failed to investigate Officer Mudd. However, because the Court has determined that both Chief Conrad and Officer Mudd are entitled to summary judgment on the merits of each of Juillerat's remaining claims against them, the Court need not address qualified immunity with regard to those remaining claims. *See Jones v. Perry Cty. Fiscal Court*, 185 F. Supp. 3d 947, 965 (E.D. Ky. 2016) ("[T]he Court need not address whether [defendant] is entitled to qualified immunity because summary judgment is appropriate on the merits of Jones' claim.")

CONCLUSION

For the reasons stated herein, **IT IS HEREBY ORDERED** as follows:

(1) Plaintiff's motion for summary judgment, [DN 60], is **DENIED**.

(2) Plaintiff's motion to exclude the United States' expert witness, [DN 67], is **DENIED**.

(3) Defendant United States' motion for summary judgment, [DN 65], is **GRANTED IN PART AND DENIED IN PART**. It is **DENIED** only with respect to Plaintiff's claim of negligence.

(4) Defendants Chief Conrad and Officer Mudd's motion for summary judgment, [DN 68], is **GRANTED**.

**IT IS SO ORDERED**.

Date:

cc:     Counsel